The District Court's denial of injunctive relief here was premised on its fundamental misunderstanding of critical legal issues in the case. Although the merits issues and the irreparable injuries overlap to a certain extent, I will discuss them separately, starting with our merits claim under the Americans with Disabilities Act. The ADA is violated when the state takes action that creates a risk of unnecessary institutionalization. Here, that standard is met through uncontested record evidence. Virtually all 45,000 class members are eligible for entry into nursing homes, and the state has specifically certified that most of these individuals need these specific services in order to stay out of more expensive institutions. These individuals are among the most vulnerable members of the Medicaid population. Before these cuts were even implemented, the state acknowledged that some authorized tasks would not be completed after the cuts were made, that individuals would go longer without paid care, that in some cases a safe plan of care would not be possible, and that many individuals may be institutionalized. And those concessions can be found at ER 3342 and 3350. In other words, the state knew that these cuts would put people at risk, whether that risk was an immediate one or was the result of an irreversible but gradual decline that would end in institutionalization. Nonetheless, the state did not take the steps that are required under the ADA to avoid these injuries and to avoid this risk of institutionalization to significant members of class members. The district court concluded otherwise, but that conclusion was based on its legal errors. Initially, the district court refused to give the deference to the Department of Justice's interpretation of its own integration regulation, as is required by the Supreme Court's decision in Auer, which requires that the agency's interpretation be given controlling weight unless it is plainly erroneous. Counsel? Yes, Your Honor. You said that the state refused to take the steps to avoid violation of the ADA. In your view, what would those steps have been? Your Honor, in this case, it's an easy case, because the state really took no steps to avoid the risk of institutionalization before the cuts were made. The state has pointed out that there are other services that are available to people in its own brief, such as adult day health, other services besides in-home care, but the state took no measures to ensure that those systems were in place, that those alternatives were in place. The state did not conduct individualized reassessments before making the cuts to determine, if the state was right that some people really could withstand these cuts because they were getting more services than they actually needed, the state made no effort to conduct individualized reassessments prior to implementing the cuts to determine who exactly could withstand a reduction in hours and who couldn't. And I'd actually like to point out that the state reassesses each individual in this program every year. If the state had decided to do individualized reassessments at the time that it announced these cuts, it could be two-thirds of the way through the caseload by now if the state had tried to determine who is getting extra unnecessary hours. But here, our position is that the cut itself, the across-the-board cut, placed people at risk, and that it is that cut that the state implemented that made people at risk, and that an individualized determination would not likely have solved the state's problems because as the Washington Supreme Court has determined, individuals are receiving the level of care that the care system has determined that they require. And so the state could not have made an individualized determination and then gone on to cut programs from most beneficiaries. The other errors that the district court made in analyzing the ADA claim included applying the wrong standard. Rather than acknowledging that plaintiffs could show a risk of institutionalization in order to make out a claim under the ADA, the district court held that the plaintiffs had to show that they would be left with no choice but to be institutionalized, or that plaintiffs would have to show facial discrimination in services. In addition, as I will discuss in relation to the irreparable injury issue, because the district court misunderstood and misapplied the appropriate legal standards, the district court never determined whether a risk of institutionalization was faced by anybody other than the specific individual named plaintiffs. The district court also erred. Let me ask you this, if I can, on the ADA question. Where are you getting your standard if anything other than the Olmstead case? That is to say, as I look at Olmstead, the court tells us that one of the factors to be considered is the state's resources available to pay for other people in roughly the same category and so on. So what are we to do with that? Your Honor, in the Olmstead case, the Supreme Court discussed the issue of the state's resources, and it looked overall at the state's resources, not just at the resources of a particular agency. In the course of saying that states would not be required to fundamentally alter an existing successful Olmstead plan. But that's the regulation, right? There's an integration regulation, yes. And that's where the fundamental language comes from? Yes, Your Honor. There's a fundamental alteration regulation. Right. Does the fundamental alteration language come from anything other than that regulation? I do not believe there's any language in the ADA itself, any statutory language. And that regulation doesn't apply strictly to the situation here because that regulation talks about someone who is insisting that there be a change such that he or she be accommodated. And the regulation says, well, that change does not have to be made if it will create a fundamental alteration. Here, we're not talking about an accommodation by the state in order to provide that level of care. We're talking, in a sense, coming the other direction. To what degree can the state reduce contributions to the care? And I don't know whether that regulation by its own terms applies. Certainly some notion about you can't do it absent some constraint, I understand that. But I don't know that the regulation actually applies to the situation in front of us. Can you help me? Your Honor, I would agree that a state cannot make out a fundamental alteration defense when the plaintiffs are simply asking to maintain the status quo. Congress made a determination and then you did. I don't think you understood my question. Does this regulation that talks about fundamental alteration apply to the case in front of us? Your Honor, the regulation, to the extent, I'm not sure I am understanding your question, but the fundamental alteration regulation. My question actually is now very simple. Does the regulation that speaks to fundamental alteration apply to the case in front of us? No, I do not believe it does. Is there any other regulation or rule of law that uses the term or the concept fundamental alteration that applies to this case? No, I'm not aware of any statutory or regulatory language. There are cases that discuss the fundamental alteration defense that are applying that regulation. But the only case that is like this one is where the court actually decided whether a fundamental alteration defense could exist when the plaintiffs are seeking maintenance of the status quo is the Fisher decision where the court determined that a state could not make out a fundamental alteration defense when plaintiffs are asking to maintain the status quo. In the Supreme Court's Olmstead decision, the court discussed the fundamental alteration defense in the context of saying that where a state has a successful Olmstead plan, a court will not require the state to deviate from that plan, to modify that plan if that would constitute a fundamental alteration. Here what has happened is that the state has taken cornerstones of the existing Olmstead plan, the cornerstones being the individualized assessment through the care process to determine how many hours people require and the development of a very detailed plan of care to which clients consent. It has removed those two cornerstones without taking steps to avoid the risk of institutionalization. Well, if I understand your answer to Judge Fletcher's question, you're saying that the fundamental alteration defense is not available to the state in this case. That is correct, Your Honor. In addition to the Americans with Disabilities Act, plaintiffs have asserted claims under the Medicaid Act. But that doesn't tell us what defense is available to the state. That is to say, it may be that the state has to satisfy a lesser burden in fundamental alteration. Your Honor, I believe that the Olmstead decision makes clear that if the state is creating a risk of institutionalization, it is violating the ADA unless there is a defense available to it. And the defense that the Supreme Court has recognized as available is the fundamental alteration defense. There's no other defense that is provided for in the applicable statutes or regulations or that has been recognized by any court. And it is also clear under this Court's precedent that it is the state's burden to make out a fundamental alteration defense. And so in this case, I don't think that there's any question that if they can't make out the defense that is provided for in that regulation, that they have violated the ADA, that we've shown likely success on our ADA claim, which is what this Court would need to determine. Plaintiffs also have asserted Medicaid claims. The state has chosen to comply with the Medicaid Act's requirements of reasonable standards and of sufficiency by having an individualized process with care assessments and the development of plans of care. In Jenkins and in Samantha A., the Washington Supreme Court made clear that it is through this care process that the state determines how many hours of care individuals require. The state here has dismantled that process and has imposed cuts that it acknowledges are driven by the budget and do not even purport to be based on an assessment that people need fewer hours of care in a way that renders their program unreasonable under the Medicaid Act and renders the services insufficient to accomplish the purposes of the program. The district court misread the applicable precedent in holding that the reasonable standards requirements and the sufficiency requirements did not apply here because we are dealing with reductions in services instead of the total elimination of services or loss of eligibility for services. The district court also made a series of fundamental errors in rejecting plaintiffs' showing of irreparable injury. The district court disregarded Ninth Circuit precedent that the loss of Medicaid services is irreparable injury itself. The district court required plaintiffs to demonstrate that the services at issue are traditional medical services as opposed to in contravention of that precedent. The district court also required plaintiffs to show likely institutionalization in order to demonstrate irreparable injury rather than recognizing that for many individuals the loss of services would cause the beginning of an irreversible downhill slide that would end in institutionalization and that would itself constitute irreparable injury. And the district court required plaintiffs to show that these cuts were the sole cause of any injuries that they would experience and to exclude all other possible explanations, something that is impossible in any case dealing with people with serious health issues. The district court also decided not to resolve factual disputes where they existed and as a result of this erroneous analysis of the injuries that the named plaintiffs would suffer, the district court refused to consider the extensive evidence of injuries to significant numbers of class members besides named plaintiffs and including named plaintiffs and that includes both general evidence from experts such as Dr. LaPlante at UCSF, individuals who are familiar with the Washington State Home Care System, the agency director from Seattle, Sean Walsh. The district court made no adverse findings as to any of these general declarations except a credibility dispute as to one and made no adverse finding as to the specific individuals who were not named plaintiffs but submitted evidence about the injuries that they had experienced in just the two weeks that these cuts were in effect before this court issued a stay of those cuts on January 14th. Now I'm not speaking for my colleagues but only for myself. Here's where I am at least tentatively on this case. It seems to me that you have shown or at least certain of the named plaintiffs irreparable injury and it seems to me at least as the ADA claim you have shown serious questions on the merits. I'm not yet convinced that you've shown likely success on the merits so for the moment let's stay with serious questions on the merits. That brings us within the Wild Rockies case which means that you have to show a balance of hardship if you're going to prevail tipping sharply in favor of the plaintiffs. Can you tell me how you might satisfy that standard? Yes, Your Honor. I think this court has made clear in decisions like California Pharmacists, Independent Living Center and Dominguez that when individuals who are low-income individuals, they've qualified for Medicaid because they are low-income, they're vulnerable individuals, they're elderly individuals with moderate to severe disabilities who would be in nursing homes if it were not for these services, that an injury to those individuals, the possible deprivation of health care that they need outweighs the injury to a state, even a state facing a severe budget crisis. And in those other cases the state was California where there's a very severe budget crisis that the state faces. Those cases also held that the injury to the federal government of the violation of the supremacy clause outweighed the injury to the state that would be caused by imposing requirements that would cause the state to have to spend more money. Now, in a sense, you've made the case easier for yourself. And you may be right on this one. As we're talking about balance of hardships, and obviously the hardship imposed on one side, of course, is to your clients. I understand that. You kind of abstracted and depersonalized the injury on the other side and merely characterized it to the state. Is it possible that it's more specific in terms of where that money is going to come from if the money comes to your clients? That is to say, are there individuals or groups of individuals or particular programs run by the state that will be deprived of money if the money comes to your clients in the way that you're now requesting? Your Honor, at this point, that depends how the state chooses to comply with a preliminary injunction if this court reverses and remands for a preliminary injunction. The state could elect to raise additional revenues. The state could elect to cut from other programs that are outside this agency. The state could elect to cut from programs within this agency. But what the state may not do is impose cuts in a way that likely contravene federal law. In this case, the state actually chose to make more cuts from this program than it did on average. The average cut across the board was a 6.5% cut, and the state determined to cut this program, which was subject to these federal protections, by 10%. And the state will need to determine how it can find those funds. I'd like to reserve the balance of the time, if I may, for rebuttal. Thank you. I'd like to pursue that question when you come back. Thank you. Good morning, Your Honors. Bruce Work, representing the Washington State Department of Social and Health Services. May it please the Court. The CARE tool allocates available state funds based on the relative functional disability of recipients. It does not because it cannot determine the minimum number of personal care hours an individual requires to remain safely in their own home. But because the state has continuously and historically provided a very high level of personal care hours, and because it has done so, it has provided those personal care hours within a program, an all-encompassing comprehensive program of in-home care, the district court properly determined that the plaintiffs had failed to meet their burden to show that the reductions at issue here would result in irreparable harm. And with all respect, Judge Fletcher, the state's position is that the irreparable harm, in fact, has not been shown in this case. Irreparable is a tricky word. A lot of harm is irreparable and minor, and I think the law treats that as not irreparable harm. That is to say, you know, if I miss lunch, it's irreparable. I mean, I miss lunch. You can't go back and get your lunch. So in some ways what we're really talking about is severity of harm. And so I think we have to say that in one sense the harm here that suffered is irreparable. I mean, if I am being afforded care and during the course of the next month the care is cut by 15 hours or 20 hours or whatever it is, you can't go back and fix that. So the question really is how severe is the impact on these people rather than whether it's irreparable. Could you address the question as to how severe the impact is? Because there's some evidence on the record that this will have some fairly severe impacts on some of these individuals. I think the evidence in the record actually shows the reverse. The evidence... You don't mean the reverse. You mean you can't tell me that the hours being cut are helpful to these people? No, but I think that the evidence in the record, the evidence of harm was contradicted by the evidence presented by the department, both in terms of sort of the big picture, the historic and systemic nature of the care assessment and the in-home program itself, and also as regards to individual plaintiffs. Let me start with the big picture items. First of all, there has been, since the reductions at issue here have occurred at the beginning of the year, the department did a survey of people who received personal care services for the first time. These are people who didn't experience a reduction in hours. They received this number of hours as their first allocation of hours. Those people report universally that they're satisfied with the number of hours, that that number is adequate. And just to make sure I understand, those are people who were receiving nothing before? Those are people who were not receiving personal care hours before. And they seem to be happy now that they're getting something. Okay, that doesn't surprise me terribly. It doesn't, but one of the things that it points out is that if you have the experience of loss, you are going to be concerned about that. You're going to be apprehensive. You're going to be fearful about what will occur. But that, and I think that really what you're looking at with a lot of the evidence presented by plaintiffs is that sense of apprehension, of concern that something will change, that it will be for the worst. But, in fact, the department has a very substantial history of providing care for people. Do you think they were providing more than necessary before this occurred? What I think the department has done is sort of two things. One is that they have allocated hours in a very generous way. The number of hours that even after the reductions at issue here, the number of hours that the state allocates to people at the high end, the most acute, the people with the most functional disability, is over 100 hours more than California provides. And that's just after the allocations here. In fact, the top two categories are well over California's allocation. You know, it's a little difficult to believe because you didn't cut this because you thought they didn't need the hours. You cut it because it's a straight across-the-board budgetary cut. Correct. So now you say, well, it doesn't matter that we cut that. We were giving them more than they need before, and it's a really wonderful thing to get rid of that excess care they were having. I don't think that's a very persuasive argument. Correct. And I would understand that if there was a determination of absolute need to begin with and you reduced that, that would fit exactly with your concern. But the problem is, is that, in fact, the number of hours that were allocated previously, the number of hours that are always allocated, is not a reflection of minimal need. It's not a reflection of medical necessity. What it is is an allocation of the total amount of funds that are available based on the relative acuity of the recipient so that people at the high end, people with greater needs receive more hours, people with fewer needs receive fewer hours, and everybody else in the middle. It allocates that money out equitably, but it doesn't say this number of hours is the amount of hours that you need to remain safely in your home. Anything below that, anything below that is going to compromise your health and safety. Well, let me shift you to another question about this budgetary allotment, which you say really determines how much you're going to spend on this. There is discussion in the cases, certainly, about what the effect of a budgetary problem is on this issue. Some of the cases say budgetary problems alone are not enough. Then there are the cases that talk about what effect the cuts, what Judge Fletcher was asking about. If you keep these people in the status quo, what effect will it be on other people in this program? Because you'll increase the cuts on the other people. I understand that part of your argument. Is it not? That would be if we didn't cut here, what would you have to do to make sure that the reductions are made somewhere? Yes. Now, there's a broader problem these days with budget cuts. If you cut from not just one program in a department, but you cut from one department, you stop building roads in order to keep police, or you can take any number of problems like this. In fact, you're making a decision to start on what things are more important, education, infrastructure, safety. Is there some absolute rule that whatever excess you have to spend here has to come out of the Medicaid program? I'm not sure I'm understanding the question. Let me put it slightly differently. If you gave these people what they've been getting, and you therefore had to cut something out of the state's expenditures, why does that reduction have to come from within the Medicaid program? Well, in this case, what happened was that the governor determined that budgetary requirements meant that all state agencies had to make a 6.287 reduction in their expenditures. The departments took that and determined that the most appropriate place, or one of the most appropriate places to make that reduction would be through the personal care program, because, for the reasons that I've just mentioned, that it doesn't allocate hours based exactly on medical need, and there are a number of other elements to the in-home care program that enable people to remain in their own home. It's a large program. The reductions can be spread out. It's much better to make reductions there than, say, a smaller program that can't take those reductions as easily. Do we know whether the governor would say, yes, you still have to cut 6.2 percent out of your department, if he knew that it would be unlawful to cut some of the things you were planning on cutting? Right. You obviously can't break the law through your reductions. The law was not broken here. No, no. I say if. Sure. Let's just assume, in order to understand the arguments, let's assume the court were to say there should be a preliminary injunction. This is the kind of thing you're not allowed to cut under the law. Would somebody go to the governor and say, look, you asked us to cut 6.2 percent in every department. We are prohibited from cutting some of the things in our department. Would there be a way to say we only have to cut 5 percent in our department? Has the governor expressed the view that he would still insist on 6.2 percent in your department, even though you were not allowed to cut some of the programs? Well, the message that the courts have enjoined the action would certainly get back to both the governor and the legislature, and they would take that message, I'm sure. Is that answering your question? I think so. I'm not sure I've hit it. They'll certainly get the message, but they may not agree with it. We don't know what they would do. We have a problem in California, as you say, with some of the cuts, and the governor goes to the legislature, and the legislature says, I don't care what happens, we're not going to give you any more money for anything. But I wouldn't hold our legislature up as a model. Well, let me go back a little bit and say a little bit more about the program that's at issue here. In Washington, the population of nursing homes, the number of people in nursing facilities has continuously declined since 1992. It's continuously declined. The population of people in in-home care receiving their services in-home who had maybe previously been receiving services in nursing facilities, that population has continued to rise. That pattern of nursing homes going down, in-home care going up, has continued despite the fact that there were reductions in this program in 2009, and despite the fact that the personal care program, the method of allocating personal care hours prior to the care assessment, which is the assessment instrument that the department uses now, did a very poor job of allocating hours. Nobody thinks that the previous assessment instrument got it right, and that at that time, this was back before 2004, the department tended to authorize the maximum number of hours for everybody, 184 hours. So large numbers of people got 184 hours. There was no clarity around this number of hours is the proper amount for, you know, any individual. And yet, even during that time, the number of people in nursing homes continued to decline, the number of people in in-home care continued to rise. What that shows is that there isn't a particular number of personal care hours that is associated with medical necessity or individual need. Rather, what you have is you need a program that supports people. The number of hours that the department has chosen to authorize is a high number of hours. As I say, it's clearly higher than California. And so the reductions at issue here are made in a context in which the department is very clear that they can continue to provide support for people in their own homes, and will not be harmed. That's why this particular mandate from the legislature and from the government and from the governor was to the personal care program, because it's a program that is able to absorb that. Can I go back and just make sure that I understand your answer to Judge Reinhart's question, or your answers to Judge Reinhart's question, because they're all clustering around the same idea. And that is, I'm working on this question of balance of hardships between the parties. Of course, it's easy to understand the plaintiffs. I mean, they're a group of individuals. On the other side, I guess in the broadest sense, it's the state. And I think I heard your answer as we really don't know who is going to be hurt, who is going to lose money if we require the state to continue at the same level of funding for these plaintiffs. You mean, I certainly don't know where the reductions would come from if they're not taken from here, if that's what you're asking. Yeah, that's my question. So that gives me some problem in figuring out, when I'm trying to figure out, does the balance of hardships tip sharply in favor of these plaintiffs as distinct from the state. It's very easy to see the hardships on them. It's hard to see in any concrete sense the hardship on the state. We can see it in a generalized sense. Because you don't have any particular individual that you can attach that to. Yeah, okay. I agree. That's where we are. That's true. That's where we are on that question. But I would submit that it is the legislature's and the governor's role to take a look at those things. And they have made this decision in their functions as legislators and governors. As I hear you talk, I'm trying to reevaluate my instincts as to what constitutes irreparable harm. Does irreparable harm or what counts as harm change depending on the underlying cause of action? That is to say, is it a different kind of harm that counts as irreparable harm if it's a due process violation, or if it is an ADA violation, or if it is a Medicaid violation? And then further, I want to, so for example, if it's ADA, is the only harm that counts is an increased threat of institutionalization? Or does it also count as a harm that, in fact, life is much less pleasant, much more difficult for someone with a reduction in home care? They still stay in the home, but it's much more difficult for them. Does the fact that it's much more difficult for them, even as they stay in the home, does that count as harm? Well, I suppose it might, but one of my problems with the question is the term much. It's conceivable to me that there is some adjustment required. And clearly the department would acknowledge that when you make any sort of change, there's going to be an adjustment. You have to figure out how to reallocate your care provider's time. One of the problems with the declaration from the plaintiffs was that there was evidence that they really didn't look at how to manage their care provider's time in such a way that they would continue to get their needs met through the weekend. Here's another question that occurs to me, and it may be more appropriately directed to the other side, so you can just listen to the question. And it is, what if we were to conclude that with respect to at least some individuals that there's irreparable harm, but not as to all? What kind of a remedy do we then give? Do we require the state to continue the funding level as it was for everyone? Do we require the district court all of a sudden to go down and investigate as to who's really hurt and who's not? I mean, that's going to be a tricky question. I'm not sure what to do with it. Can you help? Well, one thing I would say is this is here on a preliminary injunction, a denial of a preliminary injunction. And the issue in that situation is should this whole program be stopped? And that's really what was before the court. Should this whole change, reduction be stopped? I think if you were to somehow ascertain, although I'm not sure how you could do it, that there was harm to this person because of the reduction, but not to the rest of these people, I would say that the injunction should perhaps apply to that individual, but not to the program as a whole. I think the point of the injunctive process is to stop some clear harm from occurring. But in this case where you have sort of an equivocal under your hypothetical, if you have some potential that some individual, but probably not most of them, are going to be harmed, that's the purpose for the further trial. So I would say that that would not support an injunction against the reduction at issue here. Okay. Don't seem satisfied with that. I do want to point out, I think, that the reductions at issue here are established in state law. So we're really talking about a state statutory support for the reductions at issue here. I just want to draw the court's- Are you talking about the emergency regulation? No, I'm talking about the statute, Revised Code of Washington 7409520, subsection 4, which says the personal care services benefit shall be provided to the extent funding is available, according to the assessed level of functional disability. Again- Do you think that contemplates an across-the-board- Well, here's what it says. Any reductions in services made necessary for funding reasons, that's exactly the situation we're talking about here, should be accomplished in a manner that assures that priority for maintaining services is given to persons with the greatest need as determined by the assessment of functional disability. So in other words, exactly what happened here- Well, does that mean that the state, whenever it wants to spend less money, can say we have a budget problem and, therefore, we're only going to spend 20 percent of what we spent on this program? No. Clearly, you can't place- Well, what does it say? You said according to the money available, is what the state statute says. Right. And the money that is available is well more than enough to- I know it's more than here. I'm trying to find out what the statute means. You say that you only get as much care as the state makes available. Isn't that what the statute says, according to the money available? Right. The state will make the money available, and then the department is to allocate that money fairly and equitably amongst the recipients. But isn't there a Medicaid statute that overrides that in terms of the- Yes, sure. But I think when the position of plaintiffs here is that the allocation of hours are specifically directed and calibrated to people's medical need, that there is a floor below which you cannot go. And I think what this statute says is, no, that's not. It's actually an allocation of the available funds. Well, see, that's the problem. I think Judge Wellenson was saying, if I can, saying how could it be that it's all based on the available funds if you're required to prevent- Because there is- Provide. And your answer is, well, we've complied. We have, because there is- Given more than is required. Right. But you were relying on a statute that says all they get is the money that the state has to make available. My point in referencing this statute is to say that this state has actually placed in statute the fact that the way that personal care hours are allocated is through a distribution of the available funding. Now, obviously, if the funding were to- You're a minute and a half over. Oh, I'm sorry. I'll give you time to wind it up. Okay, well, I probably would be repeating myself to say what I just said, but I would just say that the district court properly found that Washington State has a very comprehensive in-home care program, that these reductions do not compromise. The court's findings were very careful and well-reasoned, and were based on substantial evidence in the record, and so that order should be affirmed. Thank you very much. I'd like to start by addressing the question that Judge Fletcher posed regarding the scope of the injunction quickly and then move on to discuss the balance of hardships public interest question that we ended on earlier. In terms of the scope of the injunction, I think that this court's decision in Armstrong, and actually backed up by the Supreme Court's recent decision in Brown v. Plata, makes clear that where there is a risk of where you know that some number of people will be injured, even if it's a small number of people, and it's not possible to determine exactly who is at risk, that the injunction should be a system-wide injunction, that that is justified in this case. If there is some possible way in the future that the state can avoid risk to the individuals who are at risk and make the cut in a different way and move for modification of the injunction, that's possible. But a system-wide injunction is appropriate where we know that some people are at risk and there is not a way to determine exactly who those people are here. And your support for that is the recent Brown case? The recent Brown case as well as this court's decision in Armstrong, which I believe is also a prison conditions case, yes, Your Honor, which is cited in our briefs. In terms of the balance of hardships issue, in the independent living center in California pharmacists' cases, this court commented that Congress has recognized that Medicaid recipients are the most needy people in the country and that that's why such great import is placed on protecting their interests. Here you have a subset of Medicaid recipients at issue, those who are actually eligible for nursing home entry and would be in nursing homes if it were not for these programs. These are individuals who are close to the edge. We have had plaintiffs die since this case was filed. We know of plaintiffs who have been and individuals who have been institutionalized. Can I stop you there? Yes, Your Honor. I noticed a footnote in Judge Zille's order where he noted that one person had died, but he was very careful to say for reasons unrelated to this lawsuit, are you saying that people have died related to these cuts or are you saying that people die? Your Honor, we are not claiming that people have died because of these cuts or that we've shown that. Okay, but that's kind of what it sounded like you were saying. I mentioned that to illustrate that this population is a very vulnerable population that is living very close to the edge. These are people with severe disabilities who are at great risk of consequences. I think that's well established. I think that's absolutely right. In terms of the hardships and the interests on the other side, the state has acknowledged here, as it must, that it cannot say exactly where these funds would come from if this court were to enjoin the home care cuts. The state is entering a new budget year on July 1st. The state has many choices in terms of raising revenue, in terms of making cuts to other programs within this department or in other departments. But that's part of the state's kind of argument that if the injunction is granted and it's not allowed to go forward with these cuts, it just means that cuts will be made in other crucial programs. So what's your response to that? Our response, Your Honor, is that where there's a likely violation of federal law or where we've met that standard, the state needs to make sure that it finds ways to cuts that don't violate federal law. The state can raise revenues if it doesn't want to make any cuts. If the state does not want to raise revenues and it makes cuts, it can determine whether there are less essential programs that can be cut. We've submitted evidence in the district court that the state had elected not to close some expensive institutions. The state can decide to cut other programs that are health care programs or programs that are not health care programs. The state can decide to release more people from prison if it chooses to do that. But these cases make clear that when you are looking at the level of injury that people face in this program. You wouldn't suggest the state eliminate public workers' pensions, would you? Your Honor, there was a 3 percent, which the public employee pensions in the state, the state did elect to cut pensions by 3 percent is my understanding, which was a much lesser cut in magnitude than the cut that this program endured. I would also point out that these cuts are unlikely to save the state money. We've submitted evidence on that from Dr. LaPlante, from Charles Reed, that shows that nursing homes are much more costly. Unnecessary hospitalization, unnecessary medical visits of Medicaid recipients are costly for the state. And so it is not even clear that these cuts will end up saving the state money. And so that is not something that the state can rely on in order to establish that the hardships that the state will endure. The state seems to think it will save them money, and I'm not sure we're in a very good position to second-guess the state on that point. I understand the evidence that you put in. Let me ask you the question that I asked the other side, and that is how are we supposed to figure out what counts as harm for purposes of the irreparable harm calculation? Obviously, under ADA, it counts as harm because there's a statutory protection against institutionalization. So to the degree that we have a threat of institutionalization as a result of these cuts, that's obviously a threat of harm, whether it rises to the threat of irreparable harm, I'm not yet sure. Does it also count for purposes of harm in this calculation that even though there's no threat of institutionalization, the daily life of someone who's now had the hours cut of his or her caretaker is much more difficult? Does that count as harm, as irreparable harm in this analysis? Yes, Your Honor. Why? It does. Why? Because in this court, in California pharmacists and in Dominguez, even the loss of income was held to be irreparable injury. In those cases, it was the loss of income to Medicaid providers. Because the 11th Amendment would preclude a court from awarding a damages award after the fact and compensating people for their injury. Here, where it's loss of services, not only could people not get money after the case was over, but the money would not solve the problem of people's quality of life being worse. And the California pharmacists' decision specifically considered whether the type of irreparable injury had to be linked to the harms that the statute had issued in that case. It was Medicaid Section 30A, seeks to avoid. And in that case, California pharmacists said that the injury to the providers from the loss of income could constitute irreparable injury and that the merits determination was a separate issue. And so for purposes of irreparable injury, the diminution in the quality of life of the individuals who are receiving these services does count as irreparable injury. That irreparable injury is, Your Honor, is compounding every day. And I would encourage this Court to remount. Could you wind it up? Yes. Yes, Your Honor. I would encourage this Court to reverse and remand for entry of a preliminary injunction to prevent further days from going on and compounding these injuries. Thank you. Thank you, counsel. Thank you all very much. The case just argued will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson